UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

KEVIN MYERS, on behalf of the Estate of
MICHAEL MYERS

                              Plaintiff,

-against-                                          1:21-CV-0922 (LEK/CFH)

MARK DAVENPORT,
GLADYS CARRION, Commissioner
of the New York state Office of Children
and Family Services, and
JOSEPH IMPICCATORE, Director,
Tryon Residential Center ,

                              Defendants.

## MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

Plaintiff Kevin Myers, father of decedent Michael Myers ("Myers" or "Decedent") and duly appointed Administrator of Myers' Estate, brings this action under 42 U.S.C. § 1983 alleging violation of his Eighth and Fourteenth Amendment rights, against Gladys Carrion, Commissioner of the New York State Office of Children and Family Services ("OCFS"); Joseph Impiccatore, Director of the Tryon Residential Facility ("Tryon"); and Mark Davenport, a former employee at Tryon. Dkt. No. 1 ("Complaint"). Now before the Court are motions to dismiss brought by Defendants Carrion and Impiccatore ("Supervisory Defendants") seeking to dismiss Plaintiff's third and fourth causes of action pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Dkt. Nos. 18, 19 ("Motions to Dismiss"); Dkt No. 18-1 ("Defendants' Memoranda").[1] Plaintiff opposes the Motions to Dismiss. Dkt. No. 29. ("Response").

For the reasons that follow, the Court grants in part and denies in part Supervisory Defendants' Motions to Dismiss.

## II. BACKGROUND

### A. Factual History[2]

At all relevant times, Myers was a detainee at Tryon in Johnstown, New York. Compl. ¶ 9. Tryon is managed by OCFS. Id. ¶ 9.

Defendant Davenport was employed by OCFS as a Youth Division Aid ("YDA") at Tryon. Id. ¶ 6. Plaintiff claims that Davenport isolated himself with residents in their bedrooms after dark to "talk with [Davenport] about 'life.'" Id. ¶ 13. However, Plaintiff states that "OCFS policy … requires youth to discuss problems with counselors and psychologists employed by OCFS, not untrained Youth Division Aides." Id. The Complaint also indicates that Davenport isolated himself with residents in the woods at Tryon. Id. ¶ 12. Davenport was known to provide residents with food, candy, cigarettes, access to his personal cell phone, and access to facility phones. Id. Additionally, he contacted residents on social media after their release and even invited some to visit him after release. Id. Finally, Davenport visited residents in cottages that were outside of his duty station. Id.

In January of 2009, Davenport anally raped Myers at Tryon. Id. ¶ 3. The assault occurred when Davenport was "isolated alone with Myers" in Myers' bedroom. Id. ¶ 14.

---

[1] The memoranda of law filed as Dkt. No. 18-1 and Dkt. No. 19-1 are identical. Therefore, the Court will only cite to the memorandum filed as Dkt. No. 18-1.

[2] The following are the non-conclusory allegations set forth by Plaintiff in the Complaint. The Court assumes them to be true and draws all inferences in the light most favorable to the non-moving party. See Allaire Corp. v. Okumus, 433 F.3d 248, 249–50 (2d Cir. 2006).

1

Davenport's conduct was investigated by the New York State Police and the Institutional Abuse Bureau ("IAB") of OCFS. Id. ¶ 15. Plaintiff states that IAB "indicated" claims of sexual abuse against Davenport but he was not prosecuted. Id. Davenport was later fired by OCFS, not for the indicated claims of sexual abuse, but for failing to adequately supervise residents found smoking cigarettes. Id. ¶ 16.

Plaintiff alleges that the risk of sexual assault in youth homes is widely acknowledged and "is the subject of standards published by the United States Department of Justice under the Prison Rape Elimination Act." Id. ¶ 18.

There were two instances of sexual assault at Tryon prior to the assault on Plaintiff—one committed by another YDA and one by a teacher. Id. ¶ 20. The facility experienced additional issues relating to resident safety including the death of one resident and substantial violence toward others. Id. These issues resulted in the issuance of a "scathing" report from the Civil Rights Division of the Department of Justice. Id.

Plaintiff claims that, despite these widely acknowledged risks and past incidents, "active supervision" was not generally practiced at Tryon while Myers resided there. Id. ¶ 22. Cameras installed at the facility were not actively monitored. Id. ¶ 21. The footage was stored on a computer in the basement and deleted after 30 days absent the need to review it. Id. Additionally, supervisory staff at Tryon did not actively patrol the housing units during evening shifts. Id. ¶ 22.

The facility also did not employ two-deep supervision, a well-known technique used to eliminate opportunity for sexual abuse. Id. ¶ 25. This method of staff monitoring requires that a staff member and a child never be alone together without a third-party present, absent exigent circumstance. Id. ¶ 25, Resp. at 3. Thus, Tryon policy allowed YDAs to be alone with children. Compl. ¶ 25.

While OCFS did have policies forbidding staff from being alone with residents after lights out, they were not enforced by Tryon supervisors and were regularly ignored by Tryon staff. Id. ¶ 23.

OCFS did not have any policies: (1) requiring staff to report misconduct by other staff including misconduct committed by staff who isolate themselves with residents, id. ¶ 26; (2) preventing YDAs from bringing personal cell phones or food to the unit, which could potentially be accomplished by instituting searches before shifts, id. ¶ 27; or (3) implementing protocols for allowing children to report sexual abuse anonymously or providing sufficient information to children regarding how to file a complaint, id. ¶ 29. Additionally, the OCFS Office of the Ombudsman was not independent and did not have the authority to conduct independent investigations of sexual abuse in OCFS facilities. Id. ¶ 30.

Temporary YDAs, such as Davenport, were allowed to supervise children at the facility without receiving training on OCFS policies. Id. ¶ 24.

In a related case in the New York Court of Claims, Supervisory Defendant Gladys Carrion admitted that the preventative procedures and policies described above were feasible, were known to discourage sexual abuse and sexual grooming, and were later implemented at OCFS facilities during her tenure. Id. ¶ 34. These procedures include monitoring mechanisms, active supervision in the housing units during evening shifts, instituting two-deep supervision, stringent policies requiring staff to report misconduct by other staff, policies prohibiting YDAs from taking their cell phones or outside food with them into the housing units, mechanisms for children to anonymously report sexual abuse, and an independent OCFS Office of the Ombudsman. Id. ¶¶ 21, 22, 25, 26, 27, 29, 30. Supervisory Defendant Joseph Impiccatore

3

admitted YDAs were routinely violating OCFS policy by isolating themselves with youth in their rooms after lights out and that no corrective action was taken. Id. ¶ 35.

In his Complaint, Plaintiff makes claims for failure to train and supervise under the Eighth and Fourteenth Amendments against Impiccatore, and deliberately indifferent failure to protect under the Eighth and Fourteenth Amendments against Carrion and Impiccatore. Id. ¶¶ 53–59, 60–67. Plaintiff alleges that Impiccatore was responsible for training, supervising, and monitoring Davenport. Id. ¶¶ 54–55. Plaintiff also claims Supervisory Defendants Carrion and Impiccatore (1) were responsible for implementing policies necessary to prevent constitutional deprivations at Tryon; (2) failed to implement such policies; and (3) were responsible for ensuring that the existing policies at the facility did not result in violations of the constitutional rights of facility residents. Id. ¶¶ 61, 63.

### III. LEGAL STANDARD

To survive a motion to dismiss for failure to state a claim, a plaintiff must plead sufficient facts that, when "accepted as true, [make the claim] 'plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is plausible on its face when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678.

In evaluating a motion to dismiss made under Rule 12(b)(1) or (6), a court must accept as true the factual allegations contained in the complaint and draw all inferences in favor of the plaintiff.[3] See Carter v. HealthPort Techs., LLC, 822 F.3d 47, 56-57 (2d Cir. 2016) (giving

---

[3] This is true for 12(b)(1) motions, at least where the attack on standing relies on the allegations in the complaint, rather than an introduction of extrinsic facts. Russo v. City of Hartford, 184 F. Supp. 2d 169, 178 (D. Conn. 2002) (explaining that, where a defendant proffers evidence beyond

4

standard for Rule 12(b)(1)); Allaire Corp. v. Okumus, 433 F.3d 248, 249–50 (2d Cir. 2006) (same for Rule 12(b)(6)). "Nonetheless, conclusory allegations are not entitled to the assumption of truth." Francis v. Kings Park Manor, Inc., 992 F.3d 67, 72 (2d Cir. 2021). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Iqbal, 556 U.S. at 678.

Title 42 U.S.C. §1983 sets forth a civil right of action for constitutional deprivations committed by actors under the color of state law. To state a claim regarding a government official's liability for violation of a constitutional right under Section 1983, a plaintiff must allege that the defendant was personally involved in the constitutional violation. Tangreti v. Bachmann, 983 F.3d 609, 620 (2d Cir. 2020); see also Wright v. Smith, 21 F.3d 469, 501 (2d Cir. 1994).

### IV. DISCUSSION

Plaintiff asserts that Myers was subjected to cruel and unusual punishment by Davenport in violation of the Eighth Amendment, Compl. ¶¶ 42–46, that Impiccatore violated Myer's Eighth Amendment rights by failing to supervise Davenport, id. ¶¶ 53–59, and that Supervisory Defendants Impiccatore and Carrion violated Myer's Eighth Amendment rights[4] by failing in their affirmative duty to protect him, id. ¶¶ 60–67. The Supervisory Defendants argue that

---

the pleadings in support of its Rule 12(b)(1) motion, "there is no presumptive truthfulness to the facts alleged in the complaint, and the court may consider evidentiary matter presented in an affidavit or otherwise in addition to the complaint." (citing Kamen v. AT&T Co., 791 F.2d 1006, 1011 (2d Cir. 1986)); see also See Katz v. Donna Karan Co. Store, L.L.C., 872 F.3d 114, 119 (2d Cir. 2017).

[4] Plaintiff also brings this claim under the Fourteenth Amendment, however, the Fourteenth Amendment applies to claims regarding pretrial detainees. Kingsley v. Hendrickson, 576 U.S. 389, 400 (2015) (distinguishing between claims made by a pretrial detainee, which are brought under the Fourteenth Amendment, and claims made by a post-conviction detainee, brought under the Eighth Amendment).

Plaintiff has not alleged sufficient facts to establish that they were personally involved in the violation of the Decedent's rights as required by Tangreti. Def. Mem. at 5 (citing 983 F.3d at 619). In response, Plaintiff largely relies on Supervisory Defendants' status as policymakers to establish personal involvement. Compl. ¶¶ 7–8. Plaintiff argues that where a policy-making official knew or should have known that employees were engaging in proscribed conduct and failed to implement a more effective policy to prevent such conduct, the official demonstrates deliberate indifference. Resp. at 5.

### A. Personal Involvement

In the past, courts in the Second Circuit have relied on the factors set forth in Colon v. Coughlin, 58 F.3d 865 (2d Cir. 1995) as the primary standard for determining personal involvement. However, this standard was called into question when the Supreme Court precluded special standards for supervisory liability under 42 U.S.C. § 1983 in Iqbal. 556 U.S. at 676–77; Tangreti, 983 F.3d at 615. Instead, "a plaintiff must plead that each government-official defendant, through the official's own individual actions, has violated the Constitution." Iqbal, 556 U.S. at 676. The Supreme Court reasoned that the showing of culpability required to hold a supervisory government official liable for a constitutional violation can be no less than is required for anyone else charged with the same violation. Id. at 676–77; see also Tangreti, 983 F.3d at 618 ("The focus is on what the supervisor did or caused to be done, 'the resulting injury attributable to his conduct, and the *mens rea* required of him to be held liable, which can be no less than the *mens rea* required of anyone else.'") (quoting Porro v. Barnes, 624 F.3d 1322, 1327-28 (10th Cir. 2010)).

Later, in Tangreti, the Second Circuit clarified the fate of the Colon factors by articulating the standard for liability of government officials sued under Section 1983. See 983

6

F.3d at 616. At the summary judgement stage, the court in Tangreti held that "[t]o hold a state official liable under § 1983, a plaintiff must plead and prove the elements of the underlying constitutional violation directly against the official without relying on a special test for supervisory liability." Id. at 620.[5] To establish personal involvement, a plaintiff must also "allege facts showing a 'tangible connection between the acts of [each] defendant and the injuries suffered.'" Putvain v. Baker, No. 20-CV-125, 2021 U.S. Dist. LEXIS 251144, at *15 (D. Vt. Dec. 16, 2021) (quoting Bass v. Jackson, 790 F.2d 260, 263 (2d Cir. 1986))

        *1. Personal Involvement due to Failure to Supervise*

The Court finds that the facts alleged under Plaintiff's third cause of action against Impiccatore for failure to supervise do not meet the standard articulated in Tangreti. Compl. ¶¶ 53–59. Plaintiff alleges that Impiccatore failed to supervise Davenport and that this failure made it possible for Davenport to commit the assault and constitutional violations against the Decedent. Id. ¶¶ 54–59.

First, the allegations Plaintiff provides to support this assertion are mostly conclusory. The Complaint alleges that the lack of supervision caused the sexual assault to occur without providing further facts to support that direct link. See e.g., id. ¶¶ 55–56 ("Davenport was not properly supervised, in that he had the presumption of privacy necessary to sexually assault the

---

[5] In his Response, Plaintiff claims that the rule articulated in Cash v. County of Erie, 654 F.3d 324 (2d Cir. 2011) should be applied in this case. Resp. 4–6. The court in Cash found that where policymakers knew *or should have known* that employees were engaging in prohibited conduct and failed to take steps to remedy clearly ineffective policy, that amounted to a "municipal policy" sufficient to support a claim for *municipal* liability. 654 F.3d at 344 (emphasis added). Cash is not applicable to this case because the standard for municipal liability differs from that governing *individual liability* as set forth in Tangreti. Plaintiff does not presently pursue municipal liability. Compl. ¶¶ 7, 8.

decedent. Defendant Impiccatore had an affirmative responsibility to monitor Defendant Davenport and failed to do so.").

Second, as stated above, Iqbal and Tangreti require that the elements of an underlying constitutional claim be established against each defendant individually. Iqbal, 566 U.S. at 675–676; Tangreti, 983 F.3d at 620. Liability based solely on the actions of a subordinate under the watch of a superior, or solely due to a failure to supervise, without more, constitutes precisely the type of vicarious, *respondeat superior* liability that Iqbal and Tangreti eliminate. Iqbal, 566 U.S. at 676 ("Government officials may not be held liable under a theory of *respondeat superior*"); Tangreti, 983 F.3d at 618 ("There is no special rule for supervisory liability"). Supervisory Defendant Impiccatore cannot be deemed directly involved in a constitutional violation based solely for negligently supervising the alleged offending party. Tangreti, 983 F.3d at 619 ("[I]t is not enough for [Plaintiff] to show that [Defendant] was negligent, or even grossly negligent, in her supervision of [the offending parties]"). Therefore, the Court grants Defendants' motion to dismiss as to this cause of action.

   1. *Personal Involvement Due to Policymaking Activity*

However, the Court finds that Plaintiff's fourth cause of action for deliberate indifference and failure to protect against Impiccatore and Carrion adequately alleges specific policy-making actions taken by those two defendants. These allegations bring this claim outside the type of supervisory liability precluded by Iqbal and Tangreti.

Tangreti makes clear that, "after Iqbal, [a p]laintiff can no longer succeed on a §1983 claim against [a d]efendant by showing that a supervisor behaved knowingly or with deliberate indifference that a constitutional violation would occur at the hands of his subordinates, *unless* that is the same state of mind required for the constitutional deprivation." 983 F.3d at 618

(quoting Dodds v. Richardson, 614 F.3d 1185, 1204 (10th Cir. 2010)) (emphasis added). Thus, an official's conduct in making and executing policy, or failing to make or execute policy, may satisfy Iqbal's requirement of personal involvement if such conduct meets the elements required to establish an underlying constitutional violation and is undertaken with the required state of mind. Stone v. Annucci, No. 20-1326, 2021 U.S. Dist. LEXIS 186195, at *29–30 (S.D.N.Y Sept. 28, 2021) (stating that personal involvement exists "where a plaintiff can establish that a senior official promulgated an unconstitutional policy with a culpable mental state").

Accordingly, a plaintiff may establish a policy-making official's personal involvement by, first, alleging facts from which it may be reasonably inferred the official was responsible for making relevant policies, and thus there is a tangible connection between their policymaking conduct and the alleged harm. Stone, 2021 U.S. Dist. LEXIS 186195, at *36 (finding personal involvement where plaintiffs "plausibly alleged that [defendants] bore the responsibility for creating or allowing the continuance of policies and customs that allowed sexual violence at [DOCCS facilities] to occur.") (quoting Pusepa v. Annucci, No. 17-CV-7954, 2019 U.S. Dist. LEXIS 26292, at *5 (S.D.N.Y. Feb. 19, 2019)). Second, a plaintiff must establish the elements of the underlying claim directly against each defendant. For an Eighth Amendment failure to protect claim, those elements are that the defendant was aware of a risk of substantial harm to the plaintiff and—through their own actions in making a policy or failing to enact a policy— exhibited deliberate indifference and disregard for that risk.[6]

---

[6] Both district and circuit courts have accepted this view. See Zielinski v. Annucci, 547 F. Supp. 3d 227, 238 (N.D.N.Y 2021) (stating plaintiff-inmate could establish Eighth Amendment denial of food claim against policymaking official if plaintiff directly established violation by showing official "'personally knew of and disregarded an unreasonable risk of serious harm' to plaintiff's health as a result of his [policymaking] conduct."); Stone, 2021 U.S. Dist. LEXIS 186195, at *30–33 (finding that "a senior prison official [including the Commissioner of the Department of Corrections] can still be held liable for his role in creating a policy by which violations of the

The Court finds Plaintiff has alleged sufficient facts to plausibly infer that both Supervisory Defendants were personally involved in the constitutional deprivation as policymakers.

As alleged in the Complaint, Carrion was the "Chief Policy Maker for OCFS" as OCFS Commissioner and was responsible for supervising all NYS OCFS facilities. Id. ¶ 7. Plaintiff also states that Carrion, as OCFS Commissioner, and Impiccatore, as Director of Tryon, were responsible for implementing and maintaining policies to protect children against constitutional deprivations and abuse at Tryon. Id. ¶¶ 61–63; See Stone, 2021 U.S. Dist. LEXIS 186195, at 36 (finding personal involvement where complaint alleged that defendant "as acting commissioner was at all relevant times responsible for enacting policies governing inmate safety and ensuring that such policies are enforced"). The Court finds that these facts plausibly show that both Supervisory Defendants were policymakers who "bore the responsibility for creating or allowing the continuance of policies and customs that allowed sexual violence at [Tryon] to occur." Stone, 2021 U.S. Dist. LEXIS 186195, at *36.

The question then becomes whether Plaintiff has alleged sufficient facts to establish the underlying elements of deliberate indifference against the Supervisory Defendants due to their actions as policymakers.

### B. Deliberate Indifference

---

Eighth Amendment occurred, but only if he can be shown to have acted with the necessary mens rea of deliberate indifference"); Abernathy v. Comm'r of Correction, No. 20-CV-00628, 2021 U.S. Dist. LEXIS 64738, at *6 (D. Conn. Apr. 2, 2021) (suggesting that the promulgation of an unconstitutional policy given "subjective knowledge of a substantial risk of serious harm" that an official "disregarded" could support a claim of liability for Eighth Amendment deliberate indifference); see also Dodds v. Richardson, 614 F.3d 1185, 1199 (10th Cir. 2010) (holding that a plaintiff can establish direct involvement in a constitutional violation where a policymaker knew of and disregarded an unreasonable risk of harm to the plaintiff); OSU Student All. v. Ray, 699 F.3d 1053, 1076 (9th Cir. 2012) (agreeing with the holding in Dodds).

"[T]o state a claim under the Eighth Amendment on the basis that a defendant has failed to prevent harm, a plaintiff must plead both (a) conditions of confinement that objectively pose an unreasonable risk of serious harm to their current or future health, and (b) that the defendant acted with 'deliberate indifference.'" Tangreti, 983 F.3d at 618–19. The second prong of deliberate indifference is met where a defendant had knowledge of a risk of substantial harm to the plaintiff and disregarded that risk. Id. at 619. The state official must know of information that allows him to make an inference of an excessive risk to the plaintiff's safety and he must actually make that inference. Id. Tangreti is clear that "plaintiff must plead and prove that the supervisor had *subjective* knowledge of serious risk of harm … and disregarded it." Id. at 616 (emphasis added). Furthermore, it is not sufficient to show only that the supervisor "should have known" of a risk. Id. 612.

Regarding the objective prong: existence of an unreasonable risk of harm to Myer's health, Plaintiff alleges previous instances of sexual assault at Tryon, as well as other significant issues related to resident safety, and a scathing report issued by the Department of Justice regarding safety concerns at the facility. Compl. ¶ 20. The Court finds these allegations of prior, similar attacks and of general risks to health are sufficient to find a general, unreasonable risk of harm existed as to Plaintiff. See Dietrich v. Cty. of Orange, No. 19-CV-10485, 2020 U.S. Dist. LEXIS 159262, at *9 (S.D.N.Y. Sep. 1, 2020) (a plaintiff may sustain a failure to protect claim based on a "general risk of harm . . . by alleging 'that the defendants knew of a history of prior inmate-on-inmate attacks similar to the one suffered by the plaintiff'") (quoting Parris v. N.Y. State Dep't Corr. Servs., 947 F. Supp. 2d 354, 363 (S.D.N.Y. 2013). Indeed, Defendants do not dispute at this stage that Myers was confined at Tryon in conditions that objectively posed an unreasonable risk of serious harm. See generally Defs.' Mem.

11

Regarding the second prong of the failure to protect standard, Plaintiff argues that Supervisory Defendants' knowledge of a risk of serious harm, coupled with their inaction as policymakers bearing an affirmative duty to protect residents against constitutional deprivations, is sufficient to show deliberate indifference. Resp. at 4–7.

While eventually a plaintiff must show that the defendant was aware of facts giving rise to an inference of substantial harm and that he *actually made that inference*, Federal Rule of Civil Procedure 9(b) provides a relaxed standard for pleading intent or knowledge at the motion to dismiss stage. Stone, 2021 U.S. Dist. LEXIS 186195, at *35. In this context, a plaintiff is allowed to "generally" plead the knowledge necessary to establish deliberate indifference because "[c]ourts recognize the common-sense principle that a plaintiff will often not be equipped to come forward with direct evidence of a defendant's subjective or actual knowledge or his intent" at the motion to dismiss stage of litigation. Id. at *35; see also Kaplan v. Lebanese Canadian Bank, 999 F.3d 842, 864 (2d Cir. 2021) ("A complaint is allowed to contain general allegations as to a defendant's knowledge because a plaintiff realistically cannot be expected to plead a defendant's actual state of mind."). Thus, to meet the knowledge requirement of deliberate indifference sufficient to survive a 12(b)(6) motion, a plaintiff need only "include allegations of the facts or events they claim give rise to an inference of knowledge." Stone, 2021 U.S. Dist. LEXIS 186195, at *37 (citing Kaplan, 999 F.3d at 864).

Therefore, to meet the subjective prong of the Eighth Amendment deliberate indifference standard at the motion to dismiss stage, Plaintiff must: (1) allege facts that give rise to an inference that Supervisory Defendants knew of a risk of serious harm to the decedent and (2) allege facts sufficient to reasonably infer Supervisory Defendants disregarded that risk by failing to enact adequate policies to protect against it.

Regarding the first prong, Plaintiff has alleged facts sufficient to infer that Impiccatore and Carrion were aware of an excessive risk of harm to the Decedent. Plaintiff alleges there were prior instances of sexual assault committed by YDAs and other staff members at Tryon. Compl. ¶ 20. These previous instances of sexual assault at the same facility, one resulting in impregnation of a resident, support the assertion that Supervisory Defendants had knowledge of a risk of such assaults to the Decedent. Stone, 2021 U.S. Dist. LEXIS 186195, at *37–38 (finding first prong met in part due to existence of past sexual assaults at facilities generally). Plaintiff also alleges one of the previous assaults had been committed by a YDA, Compl. ¶ 20, and Impiccatore admitted that he was aware YDAs were routinely violating OCFS policy by isolating themselves with youth in their rooms after lights out, id. ¶ 23. Standards published by the Department of Justice under the Prison Rape Elimination Act, of which Supervisory Defendants were likely aware, highlight the danger of sexual abuse to children in residential youth facilities. Id. ¶ 18; cf. Stone, 2021 U.S. Dist. LEXIS 186195, at *37 (finding complaint sufficiently pled policymaking defendants were aware of a serious risk of sexual abuse in part due to "reports on prison rape, including DOCCS reports of which [defendants] were likely aware"). The Department of Justice had previously issued a "scathing" report on the facility regarding the dangers the residents there faced. Compl. ¶ 20. The Court concludes that these facts, taken together, lead to a plausible inference that Supervisory Defendants were aware of an excessive risk of harm and that "existing policies . . . were deficient." Pusepa, 2019 U.S. Dist. LEXIS 26292, at *24.

Additionally, Plaintiff has alleged facts sufficient to reasonably infer Supervisory Defendants disregarded this known risk of serious harm. A defendant may be found to have disregarded a risk where they are aware of procedures that, if implemented, will mitigate a

13

known serious risk, but chooses not to implement them. See Stone, 2021 U.S. Dist. LEXIS 186195, at *37–38 (finding policymaker-defendants' failure to implement procedures known to mitigate a risk of sexual assault sufficient to demonstrate disregard for that risk). Plaintiff alleges that Supervisory Defendant Carrion admitted that preventative procedures such as monitoring mechanisms, active supervision, stringent misconduct reporting policies, and searching YDAs before reporting to their duty stations were feasible, were known to discourage sexual abuse and sexual grooming, and were later implemented at OCFS facilities during her tenure. Compl. ¶ 34. Carrion also admitted that she did not implement any such policies prior to the assault on Myers despite the known risk. Id. Similarly, Plaintiff plausibly alleges that Impiccatore was aware that YDAs routinely violated facility policies, including those that prohibit staff from being alone with residents after lights out, and admitted that he did not take corrective action. Id. ¶¶ 23, 35. Plaintiff also alleges that Impiccatore failed to implement preventative policies either prior to or following these violations, even after previous sexual assaults and safety issues. Id. ¶¶ 62–63.

Based on these facts, accepted as true and viewed in the light most favorable to Plaintiff, the Court finds it is plausible that Impiccatore and Carrion were aware of a substantial risk of harm and disregarded that risk by failing to remedy ineffective policy under which the constitutional violation occurred. Therefore, Plaintiff has sufficiently alleged a claim of deliberately indifferent failure to protect and Defendants' Motion to Dismiss is denied with respect to the fourth cause of action.

## V.     CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Supervisory Defendants' Motions to Dismiss (Dkt. Nos. 18, 19) are **GRANTED** with respect to Plaintiff's third cause of action for failure to supervise; and it is further

**ORDERED**, that Supervisory Defendants' Motions to Dismiss (Dkt. Nos. 18, 19) are **DENIED** with regard to Plaintiff's fourth cause of action; and it is further

**ORDERED**, that the Clerk of the Court shall serve a copy of the Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED: July 29, 2022
Albany, New York

LAWRENCE E. KAHN
United States District Judge